IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOHN COMBS, | ) | |
| | ) | |
| Plaintiff, | ) | 8:12CV429 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM AND ORDER ON |
| Commissioner of the Social Security | ) | REVIEW OF THE FINAL DECISION OF |
| Administration, | ) | THE COMMISSIONER OF SOCIAL |
| | ) | SECURITY |
| Defendant. | ) | |
| | ) | |

John W. Combs filed a complaint on December 18, 2012, against Michael J.
Astrue, who was then serving as Commissioner of the Social Security
Administration.[1]  (ECF No. 1.)  Combs seeks a review of the Commissioner's
decision to deny Combs' application for (1) disability insurance benefits under
Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and (2)
Supplemental Security Income (SSI) benefits under Title XVI of the Social
Security Act, 42 U.S.C §§ 1381 et seq.  The defendant has responded to the
plaintiff's complaint by filing an answer and a transcript of the administrative
record.  (See ECF Nos. 10-11.)  In addition, pursuant to my order of March 20,
2013, (ECF No. 13), each of the parties has submitted a brief in support of his or
her position.  (See generally Pl.'s Br., ECF No. 14; Def.'s Br., ECF No. 19.) After

---

[1] On February 14, 2013, Carolyn W. Colvin was appointed to serve as Acting
Commissioner of the Social Security Administration; therefore she has been
substituted as a party in this case pursuant to Federal Rule of Civil Procedure 25(d).

1

carefully reviewing these materials, I find that the Commissioner's decision must be affirmed.

## I.   BACKGROUND

On June 15, 2009, Combs protectively filed applications for disability insurance benefits under Title II and SSI benefits under Title XVI of the Act. (See ECF No. 11, Transcript of Social Security Proceedings (hereinafter "Tr.") at 166-72.) After his applications were denied initially and on reconsideration, (id. at 91-94, 98-108) the plaintiff requested a hearing before an administrative law judge (hereinafter "ALJ").  (Id. at 26.)  This hearing was conducted on August 9, 2011. (Id. at 27-48.) The ALJ ordered a consultative examination, and a supplemental hearing was held on January 5, 2012. (Id. at 49-84.) In a decision dated February 24, 2012, the ALJ concluded that Combs was not entitled to disability insurance benefits or SSI benefits. (Id. at 7-25).  The Appeals Council of the Social Security Administration denied Combs' request for review.  (Id. at 1-6.)  Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Combs seeks judicial review.

## II.   SUMMARY OF THE RECORD
### A. Medical Evidence

Combs alleged that his disability began on June 10, 2009. (Tr. at 10.) He was born on April 11, 1964, and was 45 years old on the date of the alleged onset of his disability. (Tr. at 18.) He has at least a high school education and is able to communicate in English. (Id.)

Prior to the alleged onset date, Combs sustained a work-related injury to his left shoulder on May 19, 2008, while working for Cyc Construction, Inc. (Tr. at 240.) An MRI on June 11, 2008, indicated an intrasubstance tear of his rotator cuff, and he had associated tendinitis. (Tr. at 240, 249.) Michael Morrison, M.D., recommended that Combs take part in outpatient physical therapy to improve range of motion and shoulder girdle strengthening and that he take anti-inflammatory medication. Combs was restricted at work from using his arm to reach, lift, or carry. (Id.)

Combs saw Morrison on July 18, 2008, for continued pain on the outer aspect of his left upper arm. (Id. at 245.) He also reported that his left arm was shaking. (Id.) Morrison did not have any explanation for the shaking. Combs was advised to use a sling for comfort as needed. (Id.) Combs was later evaluated by neurology about numbness in his entire left arm. He was advised to resume rehabilitation and anti-inflammatory medication. (Id. at 243.) Morrison also completed an effusion (aspiration) of Combs' knee, and he was advised to use ice and return as needed. (Id. at 244.)

By August 15, 2008, Combs reported to Morrison that his shoulder pain had diminished. Morrison determined that Combs' left shoulder rotator cuff strength and partial tear had healed. (Id. at 242.) Combs was advised that he could return to work on August 18, 2008, without restriction. (Id. at 240.)

On March 5, 2009, Combs was diagnosed as being HIV positive. (Id. at 290.)

On June 11, 2009, while in Memphis, Tennessee, Combs was playing basketball when he heard a pop in his knee and he was unable to straighten it. (Id. at 265.) X rays showed a tiny bone fragment at the inferior margin of the patella,

3

fluid in the joint capsule, and soft tissue swelling in the patellar bursa, indicating a possible injury to the patella tibial ligament. (Id. at 275.) Combs had surgery for a left patellar tendon rupture on June 12. (Id. at 265.) Combs was placed in a cylinder cast and was discharged the next day. He was allowed to bear weight as tolerated, but not to perform straight leg raises. He was given Percocet for pain. (Id. at 265.) At the same time, Combs complained pain in his wrist, but X rays showed no bone, joint, or soft tissue abnormality. (Id. at 272.)

On a disability determination form for Social Security completed by Combs' sister on July 13, 2009, Combs indicated that he has nagging pain in his low back, arm, and left leg all the time which interferes with his sleep, and that he takes two naps of 20 to 30 minutes each day. (Id. at 185-86.) Medications do not help most of the time. (Id. at 186.) Combs indicated that he was able to do all types of work before his injury. (Id. at 187.)  But at the time of his disability determination he needed help from his sisters and mother to bathe, put on his clothes and shoes, care for his hair, shave, and get up and down from the toilet. (Id. at 188.)  Combs said he needed reminders to take care of his personal needs and grooming and to take medicine. (Id. at 189.) He did not prepare his own meals because of arm and leg pain, and he could not complete any household chores by himself. (Id.)  He was living with his parents and did not have income. (Id.) Combs stated that his hobbies and interests were watching television, playing video games, and fishing, but said he had not fished since his injury. (Id. at 191, 203.)

At the time, Combs was using crutches. (Id. at 193.) He indicated that he was unable to stand for a long period of time, could not walk up and down stairs or any distance, could not do any yard work, and could not carry heavy loads. (Id. at 202.) He said he could walk about 10 minutes as long as he was wearing a knee

4

brace. (Id. at 203.) He said he could sit for about 30 minutes and then had to stand because of his knee pain. (Id. at 203.) He could not drive, he said, because his knee was swollen, and he could not put any pressure on the knee. (Id. at 202.) Combs said he could run errands only if escorted by another person and he could ride in a handicapped cart. (Id. at 203.)

Combs said he suffered from dizziness, fatigue, and depression. (Id. at 204.) He said he was not able to run, play basketball, work, or ride his bicycle. (Id. at 205.) He was taking oxycodone, Tylenol, and Advil. (Id.)  Combs said his knee pops and his legs feel heavy and go numb, making it difficult to stand, walk, or sit. Weather changes and cold weather could increase his symptoms. His symptoms improved if he elevated his leg, did stretching exercises, and rested. (Id. at 219.) The pain sometimes spread into his hips, he declared, and on a good day, his pain level was three out of 10, and on a bad day it was eight out of 10. He said he had two to three good days each week. (Id.)

On August 13, 2009, Combs saw T. Kevin O'Malley, M.D., in Omaha, Nebraska, about his knee surgery. At that time, Combs had full extension of his knee, but still had persistent effusion. He could do a straight leg raise with a brace on and flexed easily to about 40 or 50 degrees. (Id.) . He also complained of shoulder pain, but because of the need to use crutches for his knee injury, the shoulder would be addressed in the future. (Id. at 303.) Examination of the left shoulder showed decreased range of motion with decreased internal and external rotation and abduction. He had tenderness over the coracoid process and over the distal clavicle. He had pain with internal and external rotation. His rotator cuff muscles appeared to be intact, and he had some weakness in his supraspinatus. (Id.) Combs was advised to continue physical therapy, and an MRI of the shoulder

5

was planned. (Id. at 304.)

On September 16, 2009, O'Malley reported that Combs was able to do a straight leg raise and had no extensor lag. He had full extension of his knee and flexed to 90 degrees. He reported he still had some sensation of giving way in the knee, which O'Malley said was understandable due to the size of his significantly atrophic quadriceps. Combs also reported a recent fall when he was not wearing the brace. X rays showed that patellar height appeared to be unchanged. (Id. at 298.)

On the same date, Combs saw Jack A. McCarthy, M.D., about his left shoulder. (Id. at 299.) He had been able to return to fairly functional activity, but following a more recent fall, Combs noted some significant limitations in his ability to abduct his shoulder and to work out away from his body. He described most of his discomfort over the anterosuperior aspect of the glenohumeral joint. The physical exam showed no evidence of spasms or radiculopathy. Combs had mild discomfort with abduction and external rotation, but did not have any crepitation, swelling, and/or additional intraarticular changes. (Id.) He had some weakness to his rotator cuff, but no loss of rotator cuff function. An MRI showed no tear in the rotator cuff, but showed some tendinosis of the subscapularis as well as the supraspinatus. (Id.) The assessment was "left shoulder pain with possible SLAP versus anterior glenohumeral injury verus (sic) subscapularis injury." (Id.) McCarthy gave Combs an injection of Marcaine and Depo-Medrol and recommended that, after completing rehabilitation from his extensor mechanism reconstruction, further intervention for the shoulder might be considered. (Id. at 299-300.)

By October 14, 2009, Combs had full extension of the knee and could do a straight leg raise without difficulty. (Id. at 333.) He was directed to continue physical therapy. O'Malley said Combs had made very good progress and he had high hopes that he would continue to do well. (Id.)  X rays taken on November 30, 2009, showed degenerative changes in the patellofemoral joint as would be expected with his significant crepitus. (Id. at 332.)

Combs began physical therapy on August 26, 2009, for left lower extremity decreased strength, decreased range of motion, and pain.  (Id. at 301.) At the time, Combs was wearing an immobilizing brace and using a single crutch. He rated his pain at eight out of 10 and was taking prescription strength Tylenol for pain relief. He was also using ice each day for inflammation. (Id.)  He was given instructions for home exercises including quadriceps strengthening, hip adduction and abduction, left ankle dorsiflexion stretch, and left hamstring stretch. (Id.) Combs cancelled two physical therapy appointments on September 14 and September 18 and failed to come to his appointments on September 11 and September 23. (Id. at 315.) As of September 25, he had attended two visits. Combs was making slow progress and he had a difficult time making it to physical therapy sessions. (Id.)

Combs missed an appointment on October 23, 2009. By October 26, Combs reported that he was no longer using a crutch, but he was still wearing a knee brace. (Id. at 336.)  Combs attended physical therapy on November 11 and November 30, but he missed four subsequent visits and was discharged on January 22, 2010, after the therapist had not heard from him since his last visit. (Id. at 344.)

On April 27, 2010, Combs saw Miguel Daccarett, M.D., University of Nebraska Medical Center (UNMC), complaining that his left knee was very weak,

buckled, and caused some pain and grinding during flexion and extension.   (Id. at 376.) Examination of the knee showed very weak quadriceps, but Combs had full range-of-motion with flexion and extension and there was some grinding during flexion and extension of the patellofemoral joint. Daccarett suggested an MRI to see if there was any other cartilage injury or other intraarticular pathology, including loose bodies. (Id. at 376.)

Combs went to the emergency room on June 9, 2010, for knee pain after his knee gave out when he was getting into the shower and he struck the knee on the side of the bathtub. He was using crutches. He was diagnosed with a knee contusion and possible patellar tendon tear. He was instructed to stay off his leg, use rest, ice, compression, and elevation, and return for worsening or severe pain. He was discharged with Vicodin. (Id. at 391.)

On June 15, 2010, Combs visited Daccarett and reported that he could not move his knee. Daccarett ordered an MRI, which showed a partial patellar tendon tear. However, because Combs was able to do a straight leg raise, he was treated conservatively with a hinged brace set at 0 to 30 degrees of flexion and extension during the next six weeks. If during that time, Combs tore the tendon or was not able to do straight leg raises, he would be scheduled for patellar tendon repair. Otherwise the brace would be used for three months. (Id. at 389.) Combs returned to Daccarett on August 30, complaining of constant, daily pain in his left leg. He reported that he had been faithfully doing home exercise for several months. (Id. at 387.)

On September 27, 2011, Combs saw Mark Dietrich, M.D., at UNMC. (Id. at 431.) Dietrich noted that Combs walked with a slightly antalgic gait and had a slight effusion of the left knee. There was some patellofemoral crepitus with range

of motion testing. He could perform a straight leg raise and had good strength with attempted knee flexion in both full extension and 30 degrees, but it caused him some mild discomfort anteriorly over the knee. His extensor mechanism was clearly intact and there was no extensor lag noted. He had normal hip and ankle range of motion and some diffuse tenderness about the knee, both medially and laterally, and most significantly the patellofemoral compartment. He was diagnosed with moderate medial and patellofemoral compartment arthritis and post previous patellar tendon repair. Dietrich told Combs his discomfort was likely from early degenerative changes. Dietrich recommended that Combs take anti-inflammatory medications on a regular basis. (Id. at 430.) Combs also agreed to continue his exercise program and would return on an as needed basis. (Id. at 431.) On December 14, 2011, X-rays showed probable patellar tendon thickening and mild degenerative disease, but no significant joint effusion. (Id. at 429.)

During a psychological examination on September 8, 2011, Combs told Holly Filcheck, Ph.D., that he graduated from high school, but he received special education services in school. (Id. at 414.) Combs told Filcheck that he hurt his shoulder while working in construction in 2009, and he was told not to come back to work. After hurting his shoulder, Combs broke his leg and had not looked for a job since then. (Id. at 415.) He said he had been unable to work due to the shoulder and leg injuries. Combs reported that he was initially depressed after being diagnosed as being HIV positive. He took medication to assist with his mood. He stated that he has not had any feelings of depression since then. Combs denied any mental health concerns, ever being hospitalized for mental health concerns, or receiving any mental health therapy.

Filcheck reported that Combs demonstrated an understanding of the purpose

9

of the evaluation, was cooperative, and had appropriate affect. (Id.) He denied hallucinations or delusions, but he indicated he had difficulty sleeping. Combs said he has no difficulty with concentration and is not impulsive. He has no difficulty getting along with other people, although he becomes angry easily at times. Combs' daily activities include watching television, going on walks, and doing household chores. Filcheck said there is no restriction in his daily activities due to mental health concerns, and he does not appear to have difficulty maintaining his social functioning due to mental health. Combs has adequate social skills to relate appropriately to co-workers and supervisors. (Id. at 416.)

Filcheck determined that Combs has adjustment disorder with depressed mood, problems with leg and shoulder, HIV, occupational problems, and a GAF of 68.[2] (Id.) From a mental health standpoint, the prognosis was good. He appeared to have some slight symptoms of depression at times due to not working, but it did not appear to warrant any mental health treatment. (Id.) Filcheck stated that Combs' impairment does not affect his ability to understand, remember, and carry out instructions. (Id. at 419.) She indicated that his ability to interact appropriately with supervisors, co-workers, and the public, as well as to respond to changes in a routine work setting, was affected by impairments. (Id. at 420.) However, she did not mark any specific restriction, and she stated that no other capabilities are affected by the impairment. (Id.)

### B. Medical Opinion Evidence

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)).

Glen Knosp, M.D., completed Combs' residual functioning capacity (RFC)[3] examination on February 19, 2010. (Id. at 370.) Combs could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (Id. at 364.) He could stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday.  He could occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, or crawl. (Id. at 365.) Combs had no manipulative, visual, hearing, speaking, or environmental limitations. (Id. at 366-367.) Knosp determined that Combs was partially credible and that the severity of allegations was not fully supported by the medical evidence record. (Id. at 370.) Jerry Reed, M.D., affirmed the RFC and found that Combs was capable of light work activities. (Id. at 385.)

On September 8, 2011, James Wax, M.D., completed a consultative physical examination of Combs. (Id. at 400.) Combs reported that he had continued pain and limitation of motion in his left knee and a left arm injury from a fall. (Id.) Wax noted that Combs walked with a limp and used a cane. Wax said he did not believe Combs could work at the present time because he had difficulty standing and walking for any length of time and had difficulty stretching upward with both arms. Because of Combs learning disability, Wax could not see Combs working in telemarketing or any other type of sedentary job of that nature. (Id. at 405.)

Wax's report indicated that Combs can frequently lift or carry up to 20 pounds, but can never lift heavier weights. (Id. at 422.)  He could sit for 10 minutes and stand or walk for 15 minutes. Wax did not indicate any totals for

---

[3]    "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

sitting or standing in an eight-hour work day but the report stated "not working." Wax stated that Combs' cane was medically necessary, he could use his free hand to carry small objects. (Id. at 423.)  Wax stated that Combs could reach overhead, reach, handle, finger, feel, and push/pull continuously with his right hand, which is his dominant hand, and could occasionally reach overhead, frequently reach, and continuously handle and finger with his left hand. (Id. at 424.)  He could continuously operate foot controls.  Wax said Combs could frequently climb stairs and ramps, and could balance, stoop, kneel and crouch with his right side. He could never climb ladders or scaffolds, balance, or crawl. He had no visual or hearing impairment, except for a reading disability. (Id. at 425.)  Wax said Combs could not perform activities like shopping, but he could walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with the use of a single hand rail, care for his personal hygiene, and sort, handle, or use paper or files.   (Id. at 427.) Wax said Combs' mental status appeared to be normal and his coordination and reflexes were within normal limits. (Id. at 404.)

### C. Hearing Testimony

A hearing was held in Memphis, Tennessee, on August 9, 2011. (Id. at 29.) Combs was 48 years old at the time. (Id. at 31.)  He had some training as an auto mechanic while in high school and graduated, but he had  no additional vocational training. (Id. at 31-32.)   He said he could not read the hearing notice, so his daughter read it to him. (Id. at 32-33.) He said he cannot read or write a grocery list. (Id. at 33.) At the time, Combs had a driver's license, but he said he had to take the written test five or six times before he passed it. (Id. at 33-34.) His only income at the time of the hearing was about $200 monthly in food stamps. (Id. at

34.)

Combs said he could not work because he injured his left arm at work and then hurt his left leg. (Id. at 36.) Combs said he can stand for about 15 or 20 minutes before his leg swells and he has to sit down. If he sits for 15 minutes, he said he needs to get up and walk around, because his leg swells. (Id. at 36, 39.) After standing for a time, he said his leg buckles, and he has fallen once or twice. (Id. at 40.) In a typical day, Combs said he can stand and walk about two or three hours. (43) He has a hinged brace that he wears most of the time on his knee. (43-44) Combs said he could only use his arm for 25 or 30 minutes before it bothers him. (Id. at 41.) Combs takes medication for HIV, depression, and high blood pressure. (Id. at 37.) Combs said he has been told he needs one or two more operations for his leg to show improvement, but no surgery had been scheduled. (Id. at 45.)

After the hearing, the ALJ sent Combs for a consultative examination, (id. at 46.) and a follow-up hearing was held in Memphis on January 5, 2012. (Id. at 51.)

Combs said he has a learning disability and has difficulty reading and writing. (Id. at 67.) He repeated the sixth grade in school. (Id. at 54-55)  He can do simple math, but he cannot balance a checkbook. (Id. at 55.) His driver's license had been suspended for failure to pay back child support. (Id. at 57.)

At the time of the hearing, Combs had been wearing a brace on his left leg from the knee to the hip for about two weeks after slipping in the shower. (Id. at 61.) Combs said his leg had been buckling ever since. (Id. at 62.) Combs said he had never fully recovered from leg surgery he had in 2009 and is in constant pain. (Id. at 63.) Combs said he uses a cane most of the time. (Id.) In addition, he is HIV positive and he has high blood pressure. (Id. at 63-64.)

Combs stated that while he was working in construction, he cracked a bone in his shoulder when he fell and a disc in his back slipped. (Id. at 64-65.) He has learned to live with the back pain. In other medical issues, Combs said he has poor vision, but he has not had it checked for three or four years and has never been prescribed glasses. He also has ringing in his ears, acid reflux, and his stomach is "messed up." (Id. at 65-66.) Combs said he has depression and "feels bad." (Id. at 67.)

Kathy Jackson Smith, a vocational expert, testified that Combs had worked in construction work, which is a semi-skilled job that is classified as a heavy position. (Id. at 72.) Smith stated that Combs would not be able to perform any of his past relevant work based on his RFC. (Id. at 74.) She said typical sedentary jobs require reading and writing, and Combs is unable to do either. (Id.) Combs would be able to work in a light position at an unskilled job, such as a meat or poultry eviscerator, a parking lot attendant, a maintenance-type position, or a housekeeper. (Id. at 82-83.)

## D. The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a).  The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five.  See id.  In this case, the ALJ found that Combs is not disabled.  (See Tr. at 11-20.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the

14

claimant is not disabled.  See id.  The ALJ found that Combs has not engaged in substantial gainful activity since June 10, 2009, the alleged onset date. (Tr. at 12.)

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c).  The ALJ found that Combs has the following severe impairments: "status post left shoulder injury, status post left knee injury with repair surgery, obesity,  and HIV+ asymptomatic." (Tr. at 12 (citation omitted).)  The ALJ found that Combs has no severe mental impairment. His evaluation found no more than minimal mental limitations. Despite Combs' alleged learning disorder, he worked at the significant gainful activity level for many years. He was able to understand questions at the hearing and was able to provide appropriate answers. (Id. at 15.)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); see

also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a).  The ALJ found that Combs "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (Tr. at 15 (citations omitted).)  The state agency medical consultants found that Combs' severity of impairments does not meet or medically equal any listing. In addition, there was no other subsequent medical opinion in the record stating that the severity of Combs' impairment meets or medically equals a listed impairment (Social Security Ruling 96-6p).  (Id. at 16.)

Step four requires the ALJ to consider the claimant's RFC to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work."  See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f).  In this case, the ALJ wrote:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and/or carry twenty pounds occasionally, ten pound[s] frequently and stand, walk and/or sit six hours in an eight hour workday. He is restricted to following no greater than simple job instructions secondary to pain (20 CFR 404.1567(b) and 416.967(b)).

(Tr. at 16.)

16

The ALJ also found that Combs "is unable to perform any past relevant work" because he is restricted to light, unskilled work and his past relevant work was in construction, which is heavy, semi-skilled work. (Id. at 18.) Considering the claimant's age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that he can perform. (Id.) The ALJ concluded that Combs has not been under a disability from June 10, 2009, through the date of the decision. (Id. at 19.)

### III.  STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond

17

examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003). See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

Combs seeks review of the Commissioner's decision, arguing that it is not supported by substantial evidence on the record as a whole.[4] He claims he is unable to work due to the combination of the residuals of a left shoulder injury, left knee injury with repair surgery, and obesity. (Pl.'s Brf at 10.)

The ALJ found that Combs' medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC assessment. (Tr. at 17.)

Although the evidence established the existence of a severe impairment

---

[4]   Combs' argument heading states that he is challenging the ALJ's step five finding, but he discusses the RFC and the ALJ's credibility findings, which are step four issues.

which can reasonably be expected to produce some degree of pain and discomfort, the ALJ noted that pain is a matter of degree that must be evaluated in the context of medical findings, evidence and opinion, therapy and response to therapy, the RFC, and the credibility of the claimant. (Id.) The ALJ recognized that Combs' injuries impose some degree of limitation. "Yet, it appears that many of the claimant's limitations are self-imposed, and not recommended by any treating physician." (Id. at 18.)

The claimant is responsible for providing the evidence used to make a finding about the RFC. See 20 C.F.R. § 404.1545(3). The RFC is defined as what a claimant "can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence. Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004). In general, it is the claimant's burden to prove that he or she is disabled. Teague v. Astrue, 638 F.3d 611 (8th Cir. 2011); 20 C.F.R. § 404.1512; 20 C.F.R. § 416.012. The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations. Myers v. Colvin, 721 F.3d 521 (8th Cir. 2013). The ALJ is to consider all evidence, including that related to subjective complaints, the claimant's prior work record, and observations by third parties and treating and examining physicians relating to the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

19

Combs argues that the ALJ erred in rejecting the medical opinion of Wax. The ALJ did not give weight to Wax's opinion that Combs cannot work because it was not supported by other objective evidence in the record, including recent radiological evidence from UNMC. The ALJ stated that Wax's opinions seemed to be based on Combs' subjective reports rather than Wax's objective findings. (Tr. at 18.)

Pursuant to 20 C.F.R. § 404.1527(c), every medical opinion is evaluated, regardless of its source. Generally, more weight is given to a source who has a treating relationship with the claimant. Id. The opinion of such a source is given controlling weight if the source's opinion on the nature and severity of the impairment is well-supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record. Id. However, if the source's opinion is not given controlling weight, other factors taken into consideration include the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship. 20 C.F.R. § 404.1527(c)(2)(i) and (ii). The longer a treating source has treated the claimant, the more times the treating source has seen the claimant, and the more knowledge the treating source has about the impairment, the more weight will be given to the treating source's opinion. Id.

In this case, the record shows that Wax did not have a treatment relationship with Combs, but that Wax conducted a consultative examination. (Id. at 400.) Combs provided his medical history, including his knee injury, arm injury, learning disability, and reflux disease. (Id. at 401.) Wax examined Combs and found his knee enlarged, but he was able to complete straight leg raises. (Id. at 403.)  Wax said he could not see Combs working at the present time because he

20

has difficulty standing and walking for any length of time. (Id. at 405.) However, Wax also indicated that Combs could sit for 10 minutes and stand or walk for 15 minutes. (Id. at 422.) Wax did not indicate the total sitting or standing that Combs could do in an eight-hour work day. (Id. at 423.) Wax indicated that Combs could walk a block at a reasonable pace on rough or uneven surfaces. (Id. at 425-426.)

Wax observed and examined Combs on only one occasion. The ALJ's determination that Wax's report was based largely on Combs' subjective complaints is supported by the record. The ALJ is not required to discuss every factor in determining the weight to be given to a physician's opinion, but is required to provide "good reasons" for the weight given to a medical opinion. 20 C.F.R. § 404.1527(c)(2). See Oldham v. Astrue, 509 F.3d 1254 (10th Cir. 2007).

The ALJ in this case provided sufficient support for her consideration of Wax's opinion. She noted that Wax's opinions were not consistent with the treatment records, including recent radiological evidence from UNMC. (Tr. at 18). The ALJ is required to assess the record as a whole to determine whether the opinions of treating physicians are inconsistent with substantial evidence on the record. Travis v. Astrue, 477 F.3d 1037 (8th Cir. 2007), citing 20 C.F.R. § 404.1527(d)(2). If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). The ALJ has the duty to resolve conflicts in the evidence. Hacker v. Barnhart, 459 F.3d 934 (8th Cir. 2006). In this case, the record contains no assessment from any treating physician. (Tr. at 18.)

The objective medical evidence showed that after Combs' knee surgery, he had full extension of his knee and could do a straight leg raise without difficulty. (Id. at 333.) O'Malley stated that Combs had made very good progress, and

21

O'Malley had high hopes that Combs would continue to do well. (Id. at 333.) Combs was prescribed physical therapy, but the record shows that he missed a number of appointments. (Id. at 301-344.)

Wax also found that Combs would have difficulty stretching upward with both arms due to his shoulder injury. (Id. at 412.) Combs told Wax he had fractured his arm, but the medical records included no evidence of it. (Id. at 405.) Combs' alleged shoulder injury occurred prior to the alleged onset of his disability, in 2008. (Id. at 242-49, 288.) He complained of shoulder pain, but the objective medical evidence showed that he had intact rotator cuff muscles, no crepitation or swelling in his shoulder, no loss of rotator cuff function, and full strength with active abduction in his shoulder. (Id. at 299, 303.) Thus, Wax's opinion of Combs having difficulty standing and walking for any length of time and difficulty stretching upward because of both arms was inconsistent with the record as a whole, and the ALJ properly gave Wax's opinion less weight. (Id. at 18, 299, 303, 332-33, 336, 376, 389-91, 409, 412, 432-34.)

Wax's opinion does not indicate that it is based on his objective examination. Rather, as the ALJ noted, it appears to be based on Combs' self-reported symptoms. In Teague v. Astrue, 638 F.3d at 616, the appellate court found no error in the ALJ's discounting a physician's report, in part, because it "cited only limitations based on [the claimant's] subjective complaints, not his own objective findings." There is no error in the weight given to Wax's opinion by the ALJ.

In addition, the ALJ considered Combs' reported symptoms and the extent to which his symptoms were consistent with the record as a whole. (Id. at 16.) The ALJ stated that the state agency consultant's assessment which limited Combs to

light work is consistent with objective evidence in the record. (Id. at 18.) The ALJ found that Combs' statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Id. at 17.) The ALJ noted that it appeared Combs is not as limited as he alleges. (Id.) While he reported that he could not work because of left leg and left arm pain, he was able to get up and down from the examining room chairs and the examining table without any help.

When analyzing a claimant's subjective complaints of pain, the ALJ must examine: (1) the claimant's daily activities, (2) the duration, frequency and intensity of the pain, (3) precipitating and aggravating factors, (4) the dosage, effectiveness and side effects of any medication, and (5) functional restrictions. Teague v. Astrue, *supra*. In this case, the ALJ found that Combs was able to care for some personal needs without assistance. He does some household chores, but sits much of the day watching television or movies. He had not been prescribed any narcotic pain medication on a continuous basis, even though he complained of debilitating pain. And the ALJ noted that diagnostic imaging had consistently shown no greater than moderate defects in the left shoulder and left knee.  (Tr. at 17.)

The duty of deciding questions of fact, including the credibility of a claimant's subjective testimony, rests with the Commissioner. Gregg v. Barnhart, 354 F.3d 710 (8th Cir. 2003). The crucial question is not whether Combs experienced pain, but whether his credible subjective complaints prevent him from performing any type of work. Id. If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court will normally defer to the ALJ's credibility determination. Id.

The ALJ concluded, based on the testimony of the vocational expert, and

23

considering Combs' age, education, work experience, and RFC, that Combs is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Thus, the ALJ found that Combs is not disabled. (Tr. at 18.) While some evidence may support Combs' claims, the court may neither reweigh the evidence nor substitute its opinion for that of the ALJ. Young v. Apfel, 221 F.3d 1065 (8th Cir. 2000). "We may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome. Rather, if, after reviewing the record, we find that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner." Id., 221 F.3d at 1068 (internal citations omitted).

## V.   CONCLUSION

The ALJ recognized that Combs' injuries impose some degree of limitation, but the ALJ determined that many of his limitations are self-imposed and not recommended by any treating physician. The ALJ found that Combs did not suffer from any impairment of such severity that he would be precluded from performing unskilled light work activity on a sustained basis. (Tr. at 18.)

The ALJ found that Combs is unable to perform any past relevant work, but there are jobs in the national economy that he can perform. Combs is capable of performing work such as a parking lot attendant, maintenance worker, housekeeper, or meat eviscerator. Thus, the ALJ concluded that Combs has not been under a disability as defined in the Social Security Act from the amended onset date through the date of the decision.  I find that there is substantial evidence based on the entire record to support the ALJ's factual findings.  Johnson

v. Chater, 108 F.3d 178, 179 (8th Cir. 1997). I find that the decision must be affirmed.

IT IS ORDERED that the Commissioner of Social Security's decision is affirmed.

Dated February 12, 2014.

BY THE COURT:

Warren K. Urbom
United States Senior District Judge

25